**In re Thomas E. ROTH and Sharon F. Roth, Debtors.**

**Bankruptcy No. 80–B–16934.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

March 27, 1984.

William G. McMenamin, Joliet, Ill., for debtors.

August A. Pilati, Chicago, Ill., for respondent.

## MEMORANDUM OPINION

RICHARD N. DeGUNTHER, Bankruptcy Judge.

This matter comes before the Court on the Motion for Declaratory Judgment of the Debtors, Thomas E. Roth and Sharon F. Roth. The oral arguments and written briefs of counsel reflect a high level of professional creativity and diligence to their clients.

The Debtors have filed a motion seeking a declaratory judgment by this Court that the reaffirmation agreement they entered into with Midlothian State Bank, on January 12, 1981, is unenforceable. The enforceability of the reaffirmation agreement will be dispositive of the enforceability of a deficiency judgment obtained by Midlothian State Bank against the Debtors in state court. The state court, as well as the Debtors and Midlothian State Bank, have deferred to this Court for a determination of the issues.

## THE LEGAL ISSUES

The answers to these questions of law are of some importance to debtor/mortgagors and creditor/mortgagees, but particularly to undersecured creditor/mortgagees.

I. Does the mere absence of admonitions by the court in the manner described in Section 524(d)(1) of the Bankruptcy Code render a reaffirmation agreement unenforceable for failure to satisfy Section 524(c)(3) of the Code?

II. Where the real estate securing a dischargeable consumer debt has a value less than the amount of the debt sought to be reaffirmed, must reaffirmation of the unsecured portion of the debt be approved by the court pursuant to Section 524(d)(2)

to meet the prerequisite to enforceability of Section 524(c)(4)?

## CONCLUSIONS OF LAW

I. No reaffirmation agreement is enforceable unless all applicable prerequisites to enforceability are met. Particularly, in the case of a reaffirmation agreement based on a consumer debt secured fully by real estate, Section 524(c)(1), (2) and (3), as well as applicable non-bankruptcy law, must be complied with in order for the agreement to be enforceable. This means that the admonition requirement of Section 524(d)(1), via Section 524(c)(3), must be complied with in order for the agreement to be enforceable. Section 524(d)(2) and Section 524(c)(4) would not be applicable in such a case.

II. To the extent that a consumer debt sought to be reaffirmed is not secured by real property, Section 524(d)(2) and Section 524(c)(4) apply. Thus, if the real estate securing such a consumer debt has a value less than the amount of the debt sought to be reaffirmed, to the extent the debt is not secured by real estate the reaffirmation agreement must meet all four of the prerequisites listed in Section 524(c), as well as applicable non-bankruptcy law, in order to be enforceable. This includes the requirement of court approval mandated by Section 524(c)(4). The extent to which the debt is not secured by real estate is determined in accordance with Section 506(a).

## STATEMENT OF FACTS

The Debtors filed a joint petition for relief under Chapter 7 of the Bankruptcy Code on December 18, 1980. In their schedules of assets and liabilities, they listed a $40,732.45 debt to Joliet Federal Savings and Loan Association, secured by a first mortgage on their principal place of residence. Also listed was a $16,156.58 debt to Midlothian State Bank, secured by a second mortgage on the Debtors' residence. The Debtors listed the market value of the residence as $60,000, and they claimed a homestead exemption in the amount of $4,000.

A discharge hearing was held pursuant to Section 524 on March 12, 1981, before The Honorable Richard L. Merrick, Bankruptcy Judge. Present were Thomas E. Roth and the Roths' attorney, David R. Kozlowski. Sharon F. Roth did not appear at the hearing. The transcript of the Section 524 hearing reveals that the following dialogue took place, apparently comprising the entire proceeding:

The Clerk: "Thomas E. and Sharon F. Roth"

Attorney: "Mrs. Roth could not be here today, she is at school."

The Court: "Do you have any questions about your discharge?"

Mr. Roth: "No."

The Court: "I have no questions. I will enter the discharge. Here is a copy of your discharge order and one for your attorney"

Attorney: "Thank you, your Honor."

Significantly, Judge Merrick was never apprised of the existence of any debt sought to be reaffirmed by the Debtors. Accordingly, the Court entered an Order of Discharge on that date. The case was ultimately closed on April 15, 1981.

A Complaint for Foreclosure of the Debtors' residence was filed on January 20, 1983, by the first mortgagee, Joliet Federal Savings and Loan Association, in the Circuit Court for the Twelfth Judicial Circuit, Will County, Illinois, Cause No. 83–CH–40. Midlothian State Bank, a junior mortgagee, answered the foreclosure complaint filed by Joliet Federal and filed its own counterclaim to foreclose its trust deed on February 14, 1983. The Debtors, through Attorney Kozlowski, answered both complaints.

A Judgment of Foreclosure and Sale was entered by the state court, foreclosing the respective liens of Joliet Federal and Midlothian State Bank. The Debtors' residence was sold at a Sheriff's Sale for $51,-255.70. Being undersecured, Midlothian State Bank sought and obtained a $13,-751.65 deficiency judgment in state court on August 1, 1983. The Debtors, through their new attorney, William G. McMena-

min, filed a motion in the state court action to vacate the deficiency judgment. On September 14, 1983, the Debtors filed their motion for declaratory judgment in the Bankruptcy Court.

## RELEVANT STATUTORY PROVISIONS

The pertinent Code provisions are as follows:

Section 506(a)—

"An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Section 524(a)—

"(a) A discharge in a case under this title—

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, or 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or any act, to collect, recover or offset any such debt as a personal liability of the debtor, or from property of the debtor, whether or not discharge of such debt is waived; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or any act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523 or 1328(c)(1) of this title, or that would be so excepted, determined in accordance with the provisions of section 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

Section 524(c)—

"An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable non-bankruptcy law, whether or not discharge of such debt is waived, only if—

(1) such agreement was made before the granting of the discharge under section 727, 1141, or 1328 of this title;

(2) the debtor has not rescinded such agreement within 30 days after such agreement becomes enforceable;

(3) the provisions of subsection (d) of this section have been complied with; and

(4) in a case concerning an individual, to the extent that such debt is a consumer debt that is not secured by real property of the debtor, the court approves such agreement as—

(A)(i) not imposing an undue hardship on the debtor or a dependent of the debtor; and

(ii) in the best interest of the debtor; or

(B)(i) entered into in good faith; and

(ii) in settlement of litigation under section 523 of this title, or providing for redemption under section 722 of this title."

Section 524(d)—

"In a case concerning an individual, when the court has determined whether to grant or not to grant a discharge under section 727, 1141, or 1328 of this title, the court shall hold a hearing at which the debtor shall appear in person. At such hearing, the court shall inform the debtor that a discharge has been granted or the reason why a discharge has not been granted. If a discharge has been granted and if the debtor desires to make an agreement of the kind specified in subsection (c) of this section, then at such hearing the court shall—

(1) inform the debtor—

(A) that such an agreement is not required under this title, under nonbankruptcy law, or under any agreement not made in accordance with the provisions of subsection (c) of this section; and

(B) of the legal effect and consequences of—

(i) an agreement of the kind specified in subsection (c) of this section; and

(ii) a default under such an agreement;

(2) determine whether the agreement that the debtor desires to make complies with the requirements of subsection (c)(4) of this subsection, if the consideration for such agreement is based in whole or in part on a consumer debt that is not secured by real property of the debtor.

Note the intimate relationship between Section 524(c)(4) and Section 524(d)(2): In conducting a discharge hearing pursuant to Section 524(d), the bankruptcy court is required by subsection (d)(2) to make a specific determination, in the manner described in subsection (c)(4), of approval or disapproval of a reaffirmation agreement which is based in whole or in part on a consumer debt that is not secured by real property of the debtor. On the other hand, where a proposed reaffirmation agreement is based upon a consumer debt which is fully secured by real property, the bankruptcy court is not required to make a determination of the type described in subsection (d)(2).

Thus, where a reaffirmation agreement is based on a consumer debt which is fully secured by real property, the court at the discharge hearing need only follow the procedure outlined in Section 524(d)(1). That relatively simple procedure involves the bankruptcy judge informing the debtor in the manner set forth under subsection (d)(1). Proper compliance with Section 524(d), other than subsection (2), will thus be sufficient to bring the reaffirmation agreement into compliance with Section 524(c)(3). But note that this does not ensure that the reaffirmation agreement will be enforceable. The reaffirmation agreement, regardless of the nature of the security, must also comply with Section 524(c)(1) and (2), as well as applicable non-bankruptcy law.

This court finds strong support for the foregoing statutory interpretation in the comments of Bankruptcy Judge Anderson in *Winters National Bank and Trust Company v. Coots*, 2 CBC 2d 233, 4 B.R. 281, 6 BCD 429 (Bkrtcy.S.D.Ohio 1980). Judge Anderson stated that:

"Because a debt based on real estate is a dischargeable debt, the use of such a debt as consideration for a reaffirmation agreement makes that agreement subject to the provisions of § 524(c). (The Court would explain that the dischargeable portion of a debt secured by real estate is the debtor's personal liability for the debt; we acknowledge that the property itself remains subject to the debt under any mortgage agreement).

"The first requirement for an enforceable agreement under § 524(c) is the agreement must be made before the discharge has been granted. The second requirement is the debtor must not have rescinded the agreement within 30 days after the agreement became enforceable. The next requirement is the court must have complied with the provisions of subsection (d) of § 524. The final requirement of § 524(c) is, in a case concerning an individual and a reaffirmation agreement for a debt that is not secured by real property of the debtor, the court must approve the agreement according to the criteria set forth in the subsection.

We believe subsection (4) of § 524(c) is the most telling of the four subsections. First, it is the only subsection which makes specific reference to and distinction of debts that are not secured by real property. This leads the court to believe that Congress intended the other subsections of § 524(c) to apply to both debts secured by real property and those not secured by real property." *Coots*, 2 CBC 2d at 235, 4 B.R. at 282, 283, 6 BCD at 430.

"... the court must point out that the issue of court approval is the only issue on which § 524(c) and (d) distinguish between consumer debts secured by real property and those not secured by real property. The specific distinction between these two types of debts set forth only in § 524(c)(4) and § 524(d)(2) leads this Court to hold that the remainder of those sections applies equally to real property debts as well as to non-real property debts as long as the debt is a dischargeable debt as required in § 524(c)". *Coots*, 2 CBC 2d at 236, 4 B.R. at 283, 6 BCD at 430, 431.

## LEGISLATIVE HISTORY

Under the Bankruptcy Act of 1898, reaffirmation agreements were matters solely between the debtor and the creditor, with the bankruptcy court remaining uninvolved. Repayment of discharged debts was viewed as a moral obligation of the debtor not requiring judicial scrutiny. See Collier on Bankruptcy, § 524.03, p. 524–20, 21.

But the drafters of the Bankruptcy Code were cognizant of serious abuses which had occurred in relation to reaffirmation agreements under the Act. Sophisticated creditors had applied undue pressure on unsophisticated debtors to reaffirm dischargeable debts, causing many debtors to enter into ill-advised reaffirmation agreements. This was seen as undermining the "fresh start" policy of the bankruptcy laws. See HR 95–595, p. 163, note 2.

So concerned were legislators over these perceived abuses that early versions of Senate Bill 2266 and House Bill 8200, which evolved into the Bankruptcy Code, proposed the prohibition of ALL reaffirmation agreements.

The final version of this reform measure, Section 524, stopped short of the total prohibition of reaffirmation agreements, but was a clear mandate that the court was henceforth to become intimately involved with the process of reaffirming discharged debts. As described, supra, Section 524 contains specific procedural requirements which must be met in order to create an enforceable reaffirmation agreement.

The legislative history states that:

"This provision [§ 524(c)] is a significant factor in making bankruptcy relief an effective remedy. It insures that a debtor will not come out of bankruptcy in the same situation as when he went in. It contributes to the debtor's fresh start. The provision prevents creditor experience in handling bankrupt debtors from overwhelming debtors that are in a severely disadvantaged bargaining position after bankruptcy." H.R. 95–595, p. 164, note 2, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6125.

[An in-depth discussion of the history of reaffirmation agreements can be found in "Reaffirmation Agreements: A Fight For Enforceability Under The New Bankruptcy Code," 12 Cum.L.Rev. 431 (1982).]

## CASE LAW

The Court finds no case which deals directly with the precise issues presented here. Nevertheless, a review of case law under the Code provides a helpful background against which to analyze these issues. Generally speaking, there is a clear recognition in the case law of the concerns and intent of Congress in adopting Section 524(c)(3) and (4).

The roles of the debtor and creditor in the reaffirmation process are also analyzed in the cases. The courts which have passed on this subject are in agreement that the initial decision on whether or not to reaffirm a debt lies solely within the

discretion of the debtor. Neither the court nor the creditor can force a debtor to reaffirm a dischargeable debt. See *Newsome* and *Farmer*, cited infra.

These courts also agree that where the debtor does seek to enter into an enforceable reaffirmation agreement, the applicable prerequisites stated in Section 524(c) must be met. No case can be found which holds otherwise. (In *Coots*, supra, enforceability was achieved in the interest of the debtor based on non-Section 524 grounds.)

In dealing with a proposed reaffirmation agreement under Section 524(c)(4)(B)(ii), the court in *Peoples Bank of Pound v. Newsome*, 3 B.R. 626, 1 CBC 2d 1000, 6 BCD 265 (Bkrtcy.W.D.Va.1980) analogized its role in the reaffirmation process to that of a judge ruling on an "infant settlement", stating that:

"... reaffirmation in and of itself contemplates a consensual voluntary effort on the part of the debtor to bring before the Court the facts and circumstances to permit the Court to make findings with respect to the requirements of 11 U.S.C. § 524." *Newsome*, 3 B.R. at 629, 1 CBC 2d at 1003, 6 BCD at 266.

The *Newsome* court described the requirement of court approval as a "safety valve built into the Code for the benefit of debtors..." 3 B.R. at 629, 1 CBC 2d at 1003, 6 BCD at 266. It said also that allowing creditors to apply for reaffirmations would be to invite the contravention of Congress' intent to discourage creditors from pressuring debtors into ill-advised reaffirmation agreements.

In this regard, the comments of Judge Proctor in *In re Farmer*, 13 B.R. 319, 4 CBC 2d 1461 (Bkrtcy.M.D.Fla.1981) are notable. Despite the fact that the debtor in *Farmer* had applied to reaffirm the debt, the court applied Section 524(d)(2) and held that the agreement would not be in the debtor's best interest. It thus withheld approval of the agreement, rendering it unenforceable. The collateral in *Farmer*, the court noted, was worth nearly $2,000 less than the debt sought to be reaffirmed. In denying approval, Judge Proctor held

that the creditor did not even have standing under Section 524 to testify at the discharge hearing in support of the reaffirmation agreement. He stated that:

"The fact that it is the creditor and not the debtor which is vigorously pressing forward this application shows in whose interest reaffirmation would be. The Court takes judicial notice that banks are not eleemosynary institutions." *Farmer*, 13 B.R. at 320, 4 CBC 2d at 1462.

In fact, Judge Proctor noted that the debtors in *Farmer* admitted that they agreed to reaffirm the debt in question only because they couldn't afford the cost of defending themselves in a state court foreclosure proceeding. This, the court held, was not reason enough to make reaffirmation of the debt in the debtor's best interest.

The court also noted that:

"The legislative history of § 524(c) and (d) shows that the Court approval scheme was a compromise between the faction which did not wish to permit any reaffirmations and those who would have allowed limited reaffirmation. The Court perceives a duty to examine these applications carefully and to be concerned solely with the best interest of the debtor." *Farmer*, 13 B.R. at 320, 4 CBC 2d at 1462.

In *Newsome* and *Farmer* the courts found that Congress' intent would be contravened by letting creditors, rather than just debtors, apply for approval of a reaffirmation agreement. Would Congress' intent be any less contravened by allowing a reaffirmation agreement not requiring formal court approval to become enforceable without the court admonishing the debtor in accordance with the mandate of Section 524(c)(3) and in the manner described in Section 524(d)(1)? Where a debt secured fully by real property is involved, this would allow a debtor and creditor to enter into an enforceable reaffirmation agreement which never comes to the attention of the bankruptcy court.

■ This Court joins Judge Proctor *(In re Farmer)* in finding that the statutory reaffirmation scheme is to be strongly construed so as to protect the interests of debtors. This was clearly the Congressional intent and it is unlikely that those members of Congress who sought to have all reaffirmation agreements prohibited under the Code would have compromised on the statutory language with those desiring the allowance of at least some reaffirmation agreements had they believed that the statutory language, in this case the Section 524(d)(1) admonitions, would be ignored in determining the enforceability of reaffirmation agreements.

Another helpful case is *In re Miller*, 13 B.R. 697, 4 CBC 2d 1471, 7 BCD 1334 (Bkrtcy.E.D.Pa.1981). In *Miller*, the debtor applied for withdrawal of his application for approval of a reaffirmation agreement after being admonished by the court pursuant to Section 524(d)(1). The court granted the debtor's request over the creditor's objection and rejected the creditor's assertion that the reaffirmation agreement was enforceable despite the lack of court approval since the security involved was real estate. The creditors in *Miller* also apparently contended that the 30-day period during which the debtor could rescind the reaffirmation agreement began to run on the date the parties entered into the agreement.

The court held that:

"Whether or not court approval is necessary for 'preliminary' enforceability, we fail to see how the provisions of Section 524(c)(3) can be overlooked." *Miller*, 13 B.R. at 700, 4 CBC 2d at 1474, 7 BCD at 1336.

As a result, the court ruled that the 30-day period within which a debtor can rescind a reaffirmation agreement [Section 524(c)(2) ] does not begin to run until all of the prerequisites to enforceability found in Section 524(c) are met. Since the requirement in Section 524(c)(3) was not met until the discharge hearing, the 30-day period did not begin running until that time and the debtor's attempted rescission was thus timely.

The court in *Miller* added that:

"The legislative history of Section 524(c) makes it clear that the provisions for the enforceability of reaffirmation agreements were not met with unanimous approval by those drafting the Code. Indeed, the final draft of Section 524(c) is somewhat of a compromise, with strict judicial scrutiny of most agreements, *and a fully informed debtor in all*, a prerequisite to enforceability." [Emphasis added] *Miller*, 13 B.R. at 700, 4 CBC 2d at 1474, 7 BCD at 1336.

Citing *Miller* for support, the court in *In the Matter of Clements*, 18 B.R. 435, 8 BCD 993 (Bkrtcy.N.D.Ala.1982), held that until the Section 524(d)(1) admonitions were administered to the debtor at a Section 524(d) discharge hearing, the reaffirmation agreement could not become enforceable and the 30-day rescission period could not commence.

In *Clements*, the court had approved the reaffirmation agreement pursuant to Section 524(d)(2) almost five months prior to the date of the Section 524(d) discharge hearing and had administered the Section 524(d)(1) admonitions at that time. Prior to the Section 524(d) discharge hearing, the debtor defaulted on the reaffirmation agreement and the security, an automobile, was sold. The creditor then sought to collect a $2059.84 deficiency judgment from the debtor and the debtor sought to rescind the reaffirmation agreement. Judge Coleman held that:

"One purpose of 524(d) is, therefore, to give the Debtor a chance to make an informed decision regarding a 524(c) agreement. His decision necessarily comes only 'If a discharge has been granted', and consequently, *after* a discharge has been granted. Showing that the Debtors were informed of their rights and liabilities at the time the agreement was 'approved' by the Bankruptcy Court on May 20, 1981, does not militate against the effectiveness of 524(c)(3) and 524(d). The warnings of

524(d) can only be given at a 524(d) hearing. In fact, the May 20 Order specifically states that the approval is 'subject to the Order and findings at the Section 524(d) Discharge Hearing.'" *Clements*, 18 B.R. at 437, 8 BCD at 994.

The court in *Clements* concluded that: "... the reaffirmation agreement ... could not have become enforceable until the discharge hearing. To hold otherwise would negate the purpose of the warnings to be given by the court at the 524(d) discharge hearing. There would be no need to inform the Debtors of their rights if these rights stood immutable." *Clements*, 18 B.R. at 437, 8 BCD at 994.

This Court cites *Miller* and *Clements* as added support for the view that Section 524(c)(3) was not just excess verbiage and was indeed intended by Congress as a means of protecting debtors by giving them one last chance to be educated as to their rights before entering into an enforceable reaffirmation agreement and leaving the bankruptcy forum. These cases also add strength to this Court's construction of the Section 524(c) prerequisites to enforceability. It is noteworthy that the *Clements* court held that the receipt of court approval under Section 524(d)(2) does not extinguish compliance with Section 524(d)(1) as a prerequisite to enforceability of a reaffirmation agreement under Section 524(c)(3).

Also notable are the opinions of Judge Dietz in *In re Rennels, et al.*, 37 B.R. 81, 11 BCD 510 (Bkrtcy.W.D.Ky.1984) and *In Re Smith*, 35 B.R. 95, (Bkrtcy.W.D.Ky. 1983).

In *Rennels*, Judge Dietz dealt with what he perceived (quite correctly) to be a useless procedure: the broad requirement of Section 524(d) that all debtors appear at a discharge hearing to be told whether the court has granted them a discharge or why a discharge has been denied. Finding that none of the debtors in the 15 consolidated cases before him desired to reaffirm a debt, redeem property, or avoid liens, Judge Dietz excused all of the debtors from attending a discharge hearing.

The Court in *Rennels* also recognized that:

"As statutes go, Section 524 of the Bankruptcy Code is clear to the point of being blunt." 37 B.R. at 84, 11 BCD at 511.

And, the fact that Section 524(d):

"... is mandatory in nature is put beyond doubt by the use of the word 'shall' no fewer than four times in one subsection." 37 B.R. at 85, 11 BCD at 511.

The court then paid homage to the intent of Congress, noting that:

"The principal objective of Section 524(d), it will be remembered, was to erect one final bulwark in protection of the debtor's right to begin anew, one last obstacle to the avaricious creditor, in the person of the judge himself." 37 B.R. at 85, 11 BCD at 512.

Nevertheless, Judge Dietz found that "[w]ith the clear intent of Congress we are in singular accord", but that:

"By holding today that debtors may be excused from discharge hearings, considering the conditions we will impose, we do no indignity to that intent...". 37 B.R. 85, 11 BCD at 512.

Important in *Rennels* was the fact that "[t]he matters we decide today involve no property rights." 37 B.R. 91, 11 BCD at 512. Significantly, the court noted that:

"Property rights would be involved only if these debtors sought to reaffirm *any* debts, avoid liens, or redeem property." 37 B.R. at 91, note 38, 11 BCD at 515, note 38. [Emphasis added]

It seems clear that Judge Dietz' findings in *Rennels* were in no way intended to do away with the requirement that debtors intending to create enforceable reaffirmation agreements (based on consumer debts secured by real property or otherwise) must comply with, inter alia, the admonition requirements of Section 524(c)(3) and Section 524(d)(1). Clearly, in such cases, "property rights" are involved and thus, even under the framework of Judge Dietz' unique guidelines for the Western District of Kentucky, a debtor must be admonished by the court in the manner described in

Section 524(d)(1) in order to create an enforceable reaffirmation agreement.

In *Smith*, the question before the court was whether bankruptcy court approval is required in order for a reaffirmation agreement secured by real property to be enforceable. In emphatically ruling that no such approval is required, Judge Dietz commented that:

"... we would be fully prepared to stand on a statute whose language is so clear as to need virtually no interpretation." 35 B.R. at 96.

Referring to the exception of debts secured by real property from the coverage of Section 524(c)(4), Judge Dietz stated that:

"The exception juts out of the statutory landscape like a promontory of free will, exercisable by the individual alone without any paternalistic overview whatsoever. The Congressional purpose in excluding such debts from our scrutiny was to facilitate the felt need of debtors to keep their homes as part of a meaningful 'fresh start' and to remove judicial participation from the exercise of that intensely personal motive." *Smith*, 35 B.R. at 96.

The Court notes that in *Smith* the debtor was admonished by the court in the manner described in Section 524(d)(1). Section 524(c)(3) was thus complied with in this regard.

### ANALYSIS

There are two issues to be addressed. The first deals with the admonitions required by Section 524(d)(1); the second deals with the necessity for court approval required by Section 524(c)(4).

### I. Admonitions.

The record here, unlike that in *Smith*, nowhere reflects that the Section 524(d)(1) admonitions were administered to the Roths. The introductory language of Section 524(d) makes clear that subsections (d)(1) and (d)(2) apply only where "the debtor desires to make an agreement of the kind specified in subsection (c) of this section..." Obviously, the debtor must make his "desires" known to the court. If, as here, the Bankruptcy Court is not advised of the existence of a reaffirmation agreement, it has no way of knowing of the need to administer the Section 524(d)(1) admonitions at the discharge hearing.

When a debtor seeks to create an enforceable reaffirmation agreement, the Section 524(d)(1) admonitions may not be waived, regardless of whether the debt is or is not secured by real property. All the comments, cases, articles, and authorities reviewed by this Court have so stated. They have not, however, completed the equation by stating the effect of noncompliance with Section 524(d)(1) and Section 524(c)(3). We now do so.

Whether the consumer debt upon which the reaffirmation agreement is based is secured, partially secured or unsecured and whether the security is real property or not, the admonitions of Section 524(d)(1) are required to be administered. The sanction for failure to comply is unenforceability of the reaffirmation agreement. Section 524(c) states that a reaffirmation agreement is enforceable "... ONLY IF ..." subsections (1), (2), (3), and (4) are met. [Emphasis added] Where the admonitions of Section 524(d)(1) are not administered, Section 524(c)(3) is not met.

### II. Court Approval.

It appears that the creditor in *Smith* was the holder of a first mortgage on the debtors' residence. This Court, like Judge Dietz, believes Congress was cognizant of the fact that many debtors would desire to keep their homes. Congress, therefore, relaxed the "safety valve" protection it had supplied for other consumer debts.

But this Court also perceives the existence of exactly the danger that Congress sought to protect consumer debtors from under Section 524 in the form of undersecured primary mortgage holders and undersecured junior mortgage holders (such as Midlothian State Bank). The danger exists where, as here, the value of the

debtor's residence is such that the proceeds of a foreclosure sale would satisfy less than the full amount of the indebtedness. Would it be provident for a debtor to reaffirm for the full amount of the debt if foreclosure would leave him liable for a deficiency judgment? Would it be in his best interest? Of course not. This is precisely the kind of circumstance the Court inquires into where it is dealing with a reaffirmation agreement based on a consumer debt secured by personal property. See *In Re Jenkins*, 4 B.R. 651, 2 CBC 2d 307, 6 BCD 471 (Bkrtcy.E.D.Va.1980), *and In Re Farmer*, supra.

A debtor needs no less protection from an undersecured real estate mortgage holder than from an undersecured creditor with a lien on any other kind of property. Otherwise, an ill-advised debtor could reaffirm an undersecured real estate debt without an opportunity for the bankruptcy court to intervene in his best interest. This would be contrary to the clear policy of Congress requiring court approval where debtors seek to reaffirm unsecured debts.

In Section 524, Congress did not say the debt must be "fully secured." Perhaps it could have or should have, but it need not have: Section 506 mandates that interpretation. Otherwise, for example, a reaffirmation agreement based on a debt of $100,000, secured by real estate having a value of $10,000, could be enforceable without court approval. Congress would abhor such a result. Perhaps, where appropriate, a debtor might find it in his best interest to void the unsecured portion of the debt under Section 506(d). See *In Re Tanner*, 14 B.R. 933, 5 CBC 2d 503, 8 BCD 347 (Bkrtcy.W.D.Pa.1981).

In *Jenkins*, the value of the security was $200.00. The proposed reaffirmation agreement was for $792.76. Judge Bonney, in a thoughtful analysis of the policies of Congress, denied approval of the proposed reaffirmation agreement as not being in the debtor's best interest. Judge Bonney stated that:

"To sign up again for the full amount owed is a reaffirmation. Note well that the word *reaffirmation* is nowhere to be found in the Bankruptcy Code. The Congress envisioned an *agreement*, not a reaffirmation.

"[The debtor] won't obtain approval of a complete reaffirmation from this Court. Frankly, we do not anticipate that this firm hand on the part of the Court will rehabilitate him, but in this small sphere of influence the Congressional intent shall be followed.

"And what of the creditor? Are its rights trampled upon? Naturally, it would like to have its $792.76. However, while it is a 'secured creditor,' IT IS SECURED ONLY TO THE EXTENT OF THE VALUE OF ITS COLLATERAL." (4 B.R. at 653, 2 CBC 2d at 309, 6 BCD at 472) [Emphasis added]

In the first paragraph of *In Re Smith*, Judge Dietz observed that:

"In the course of conducting discharge hearings in this court, we had heretofore thought no proposition so clear as that a reaffirmation agreement *concerning* mortgaged real estate is binding on the debtor, regardless of whether the judge gives such a contract his official approval in open court." [Emphasis added] *Smith*, 35 B.R. at 95.

Judge Dietz' observation may be overly broad, depending on his definition of "concerning." Congress did not say that court approval is not required when the agreement is "concerning mortgaged real estate". Rather, Congress did say that court approval *is* required *"to the extent* that such debt is a consumer debt that is not secured by real property ..."* [Section 524(c)(4), Emphasis added]

Moreover, Section 524(d)(2) requires compliance with Section 524(c)(4) "if the consideration for such agreement is based *in whole or in part* on a consumer debt that is not secured by real property ..." [Emphasis added]

Thus, where a mortgage holder is less than fully secured, court approval is required of that portion of the debt which is unsecured. This is consistent with the in-

tent of Congress to protect debtors from entering into ill-advised reaffirmation agreements while at the same time permitting that portion of the debt secured by real property to be enforceable with minimal court involvement and without the necessity of court approval.

\* \* \*

The Court is aware that its resolution of the "court approval" issue may impose a need for a valuation hearing to determine to what extent, if any, a consumer mortgage debt is unsecured. A separate issue at such a hearing might be the date on which value is measured. In most instances, the date of filing the original petition in bankruptcy controls the rights of the parties. Section 506(a) speaks of determining value "in light of the purpose of the valuation, and of the proposed disposition or use of the property". Arguably, the date of the reaffirmation agreement, or the discharge hearing, could control.

\* \* \*

Although it is not necessary for the decision here, the Court notes that Section 524(c)(3) in plain language requires that *all* of the provisions of Section 524(d) be complied with as a prerequisite to enforceability of a reaffirmation agreement. The plural "provisions" is used. Compliance with Section 524(d)(2) is not excluded. Strange as it may seem, one is compelled to conclude, then, that the failure of the reaffirmation agreement to comply with Section 524(d)(2) renders not only the unsecured portion of the reaffirmation agreement unenforceable, but renders the *entire* reaffirmation agreement unenforceable. The coverage of Section 524(c)(3) thus overlaps with that of Section 524(c)(4). Perhaps this was a drafting oversight—perhaps not.

## CONCLUSION

 I. The absence of admonitions at the discharge hearing renders unenforceable the reaffirmation agreement between the Roths and Midlothian State Bank, regardless of whether the debt was secured to any extent by real property.

 II. To the extent the debt owed to Midlothian State Bank was not secured by real property, court approval of the reaffirmation agreement was required for enforceability.

III. For the reasons given above, the reaffirmation agreement between the Debtors and Midlothian State Bank is unenforceable.

ORDER ENTERED ACCORDINGLY.